May it please the court, counsel, Ray Barr, Maldonado, on behalf of the appellant Juan Carlos Garcia-Rivas, I'm going to attempt to leave five minutes for rebuttal, your honor. In 1994, this court decided the case of United States v. Ayala. In that case, Mr. Ayala challenged 8 U.S.C. 1326, specifically the found-in language in 8 U.S.C. 1326, as being void for vagueness. This court, in an opinion written by Judge Ferris, stated that no, the found-in language is not void for vagueness. And quoting from the case, to avoid being found in the United States, a deported alien can either not reenter the United States or, if he has already reentered the United States, he can leave. Now, the record is undisputed. On December 11th, 2010, Mr. Garcia-Rivas was walking southbound at the Douglas Port of Entry. The record shows that there was nowhere else that he could have gone but into Mexico. And for that reason, the fact that he was doing exactly what this Court has previously said he could do to avoid being found in the country, he should not have been arrested and charged with that. I don't think that the case says that he can walk past U.S. officials on his way out of the country. You are correct, Your Honor. I think what we meant was if he can get out of the country, he can get out of the country. That's one way to look at it. And I was hoping to look at it if he's in the act of actually leaving the country. So it really is the key question, is he going southbound? The key question is, what is his action? Is he leaving the country? Is he going southbound? Correct, Your Honor. Okay. So if he's in Chula Vista going southbound, it's okay. National City, San Diego, as long as it's southbound, it's okay. I think there's argument to be made, Your Honor. In this case, he was steps away from Mexico. I'm not talking miles. I'm not talking... I understand, but it's a principle you're talking about. And what you just said was he was going southbound, although he's in the United States. And under our case, that makes him home free. He gets a free ticket. That would be my proper understanding and preferable. Is there anything after Ayala that suggests that? There's additional cases that cite to Ayala holding him back. But it's all the same language. All the same language. No case that I could find on point where someone is actually trying to walk southbound. There are a couple of cases at the Canadian border where someone was walking into going into Canada and was returned. But those cases had to do with official restraint. And the argument, the void for vagueness, or the jury instructions that were proffered in this case were not subject to or were not addressed in that case. Now, he was in the United States going south towards the border, and he was intercepted by a police officer. There isn't anything wrong with that, I take it. You're not complaining about the actual stopping and asking questions. No, Your Honor. That was an issue brought up at the district court, but we didn't raise that issue on appeal. So the place when you're at the border, we have ‑‑ there's a great deal of leniency given border people to ask questions. Was there anything wrong with the questions he asked? No, Your Honor. The border search doctrine is not what we're addressing here on appeal. I don't think there was anything wrong with the questions that were asked. So one of the questions was, are you here illegally? And he said, yes, I'm here illegally. And that comes in. Correct, Your Honor. That came in, and we didn't challenge ‑‑ we challenged the use of that statement on San Juan Cruz grounds, which is different from the found in offense, which I would get to later. But specifically, if we ‑‑ if this Court is to hold, yes, Ayala says he can leave the country, and he obviously is not guilty of that. But we have a situation where people are stuck in a no man's land. The statute is not void for vagueness because they can leave, at least in theory. But if it's impossible for them to leave, shouldn't it still be found void for vagueness? Well, I don't quite get what you just told me. I didn't see anything vague about this. The officers that are doing this duty on the government, on the United States territory, everything he said was okay. But then what you're saying is, after he finds out he's been in the country illegally, that he's required to let him walk across into Mexico and he can't arrest him. That is part of the argument. I think if you would have asked another question, how did you enter the country or had you previously been deported, then there's grounds for asserting that there is a crime that has been committed. Prior to that, the only thing the officer knew was that he was unlawfully present in the country. And this Court has previously held that unlawful presence alone is not a crime. So when he was arrested, all the officer knew was that he was unlawfully present, didn't know his manner of entry, so couldn't charge him with 1325, didn't know he'd previously been deported, so couldn't charge him with 1326. Are you saying, based upon this, that the police officer could not have detained him for further interrogation, going to secondary, as it's called, that he was required to let him walk across the border? No, Your Honor. That's not my position. I think Your Honor is correct that he could have asked further questions, but at that point, the record shows he was arrested. But he's diverted to secondary, which they always do. Yeah. He was taken into custody. I think the record's clear. Not that he was arrested. Is he arrested at the border stop or is he arrested when he's taken over to the Border Patrol office later on? I believe he's arrested when the handcuffs are put on to him and he's taken over and he's left inside.  So at what point is he handcuffed? Right there the record shows when he was walking. Because he says, I'm here illegally. Right. The officer puts the cuffs on him and walks him into the building. Did anybody say at any point you're under arrest? No, Your Honor. Miranda warnings aren't given until he gets to the second place. Is that right? To the Border Patrol office? That's correct. Until he's transported 10 minutes to the Border Patrol office, that's when the Miranda warnings are given. He's not really asked anything between the time that he's detained and the time that he's given Miranda. Absolutely nothing. There's really nothing to suppress there. Nothing to suppress at that point, Your Honor. The question is whether the officer had probable cause to arrest him. Correct, Your Honor. And if he did not at the point that he was arrested, then the statement should have been suppressed. Can he arrest him for being illegally in the country? I don't think he can arrest him because to be arrested there has to be probable cause. A crime was committed, and it's not a crime. I believe he can be detained for administrative processing and sent back across the border or sent to an immigration judge, but he cannot be arrested for a crime. And getting back to the found-in argument, if we're defined that, if this Court is defined, yes, he can leave, but that he can't leave, it just puts people in no-man's land, hundreds of thousands, if not millions of people who want to do what Congress intended by passing at U.S.C. 1326, and that is saying people who have been deported do not have a right to live in our communities. At what point did the government figure out that he actually was in the country unlawfully, that he had entered unlawfully because he'd been previously deported? After he had been taken to the Border Patrol station and he was interviewed, Your Honor. Okay. Had he been given Miranda by the time? At what point did they, relative to them giving the Miranda statements, did the government realize that he had been previously deported? It was after Miranda, Your Honor. So it was – They gave him Miranda first, so simply based on the fact that he was present in the country illegally. Then they discovered that he had been previously deported. That's correct, Your Honor. And that issue that we brought up in the briefs is a San Juan Cruz case, that he was given his administrative rights, his Miranda rights, and also the consular notification. And those other two warnings, administrative rights and the consular notification, do not say with specific – do not say specifically that he's entitled to a government attorney provided for free. It says he can get a list, he can ask for a list of attorneys at little or no cost, or the consulate may assist him in attaining an attorney. Does Miranda require a statement that the government will pay for representation? Yes, it does, Your Honor. I believe it must be unequivocal. Yes, it does. I thought it was just that they provide counsel. I didn't see the words the government will pay. I believe, and, Your Honor, and I may be incorrect, but I believe it's provide counsel at no charge. I may be incorrect on that, Your Honor. Well, yes. The day when I was practicing law, you got a call from the court to come down and to represent people. And it wasn't – I can guarantee there was no pay involved. It was just – the rule was you had to provide counsel. And I was wondering about the fixation in your brief upon there was no statement that the government would pay for it. I didn't think the government was responsible for paying for it. They're responsible for providing counsel. And if they decide to pay, that's up to them. I mean, if we did away with the whole payment of counsel, we just drafted lawyers to come down and do it, I suspect that Miranda would – I suspect that the provision would be sufficient to take care of the Miranda warning. I agree, Your Honor. And perhaps I inartfully worded in my brief the point being that the defendant must know that they're not going to be charged if they can't afford counsel,  That's the point I'm making. But at that point, there are these other advisements that are given. Someone will help you get a lawyer or something, whatever. And you say that's confusing, but suppose the person has a million dollars on them. They're not entitled to a lawyer. They're only entitled to a lawyer if they can't afford a lawyer. So wouldn't the advisement that there is this assistance in getting a lawyer go to the issue of if you can afford one, these are some lawyers? I was a little confused on how you put that together. My apologies to the Court for that, Your Honor. Oh, no, no. It's not your fault. It's the whole issue here of the focus is on getting a lawyer, but you don't even get a lawyer if you can afford to get one yourself. The Miranda doesn't require that. So it would be relevant, I suppose, that they're giving advice on how you get a lawyer if you can afford a lawyer. It seemed to me your issue was that there's some confusion. They don't read well together. That's correct, Your Honor. And if it confuses the defendant, then the onus is on the government to clarify that, and they didn't take those steps in this case. How do you define the nary issue that's before us with this issue? The main issue that the Honor's question is, the main issue to me is whether or not someone who is leaving the country can still be found guilty of being found in the country. And in addition to that, there's the issue of the San Juan Cruz case and the Fourth Amendment case. But to me, the thrust of it is are we going to read Aeolus or that in the name? And I think that's what you might say the primary question before us is whether that was probable cause to arrest at the time the arrest was made. I think that's the secondary question, Your Honor. And if that's more interesting to the Court, you know, whichever way we get the victory is not going to be played out by us. What's interesting to us is what we ought to do to decide the case, and that's what I want you to tell me. What is the precise question that we ought to decide? Those two questions, Your Honor, with the third one being there. But can someone who is leaving the country being guilty of found in? And at that point, what the officer knew, specifically on this case, was there probable cause to arrest. At any point before he steps across the border, can he change his mind? Not the testimony in the record is clear that not where he was at. He was in a no-man's land, the only place he could have gone into Mexico. The officer stated if he would have tried to turn around and walk away, he would have been stopped and prevented from doing so. And the officer would have asked why he was walking the other way. If we thought that there was no probable cause here to arrest, what should we do? We would return the case to the trial court with an order to suppress the statements and order a retrial. Okay. The government would have an opportunity to show maybe inevitable discovery or something else. Perhaps, Your Honor, but I think they'd have a very difficult time showing injury at all or that he at any point knowingly remained in the country. And I'd like to reserve that. I wanted to ask you a question. You indicate it's not a crime to be in the United States illegally. But if an officer knows an individual is in the United States and the person confesses here illegally, whether that's sufficient to move forward. What I'm suggesting is even if we suppress, the district judge should have suppressed all of the statements made subsequent. Certainly, the statement he made that he's in the country illegally would not be suppressed. I think we've gone through that. Why wouldn't that be sufficient for them to move forward with confining the person subject to a continuation of investigation? Well, I think they can, Your Honor, hold him over for the administrative proceedings. I agree with you. I just don't think that they can hold him over on the criminal charge and proceed in that manner. Why is that? If a person says I'm here illegally, why does the person that he's speaking to have to take the position this is just an administrative issue? Why can't there be sufficient probable cause to look further into the illegality of the person being there? Well, I think for an arrest to occur, there has to be probable cause of an actual crime, not just the thought that there may be an actual crime occurring. I think if otherwise he would have to be let go or told he was free to leave if there wasn't enough probable cause to arrest him. So your position is that the officer should have said go ahead and go back to Mexico even though he's admitted that he's in the country illegally. The officer cannot do anything further at that stage. Is that your position? Not necessarily, Your Honor. I think he can take him over to secondary to try to get more information. Okay. But he can't actually make an arrest. What would be the result if we decided in your favor in this case he's already out of the country, he was illegally in the country. So what would be the result if you prevailed? Yeah, I think you're right. Did the United States go back into Mexico and tell him, come back, and where would we put him? Would we put him back on the border on his way out again? No, Your Honor. Come on in to California. No. I'm still in contact with Mr. Garcia-Rivas, and I just relayed to him that we won the case. That would have the specific effect on him. But more broadly speaking, if he'd still be gone, wouldn't he? He'd still be gone. He wouldn't have the additional criminal history points if he were ever to come across the country again. I see. I see. I wondered what the result would be. And in this case? I was a little curious. I thought, well, maybe you think we should bring him back. No, Your Honor. I'm sure he thinks that, but that's not our position. Is it your position that as soon as they put the handcuffs on, he was under arrest? Yes, Your Honor. With cars coming into the United States where there's the border patrol person, the initial person making the contact, suspects there's some problem, at that point that car cannot leave. And it's very frequently walked with over to secondary where they provide additional things. Is that – is the person in the car under arrest at that point? No. There's various case law that point that, Your Honor. I think just ordering – Why isn't this the sufficient – why isn't this like that? That is, if the police officer is doing it for his own protection, but wants to walk with him the way they walk with him over to secondary coming into the country, why is that necessarily an arrest? Because one – They're restrained either way. They're restrained, but they're not put in the handcuffs and they're not taken away. And it's obvious to the person at that point that it's beyond just a mere secondary inspection. They're not just going to be asked a few more questions in secondary. They're actually under arrest. So the police officer, in the way you stated, has to trust him that the person is not going to wheel on him, pull out the weapon, start running, whatever. He has to do an arrest. He can't secure him to the extent the officer believes security is necessary to get him to secondary without there being an arrest. He certainly can, Your Honor. And there are other cases in the inbound manner that talk about that, where the officer tells him, you know, I'm putting handcuffs on you for my safety. Yeah. And that wasn't done in this case. He was – Mr. Garcia-Ruiz was not told that. It was clear that it was an arrest. Why do you say it was clear there wasn't an arrest? Because he said I'm – he didn't say I'm doing this for my safety? Correct, Your Honor. He wasn't told he was doing it for his safety. He wasn't told he was going to ask him further questions. The police officer has to give all of these warnings. I don't think any of your prior holdings have said that specifically, but it is one factor going to determine if there was an actual arrest or if he was just being sent to secondary for further questioning. Okay. Thank you. My apologies for going over, Your Honor. We've taken you well over your time, counsel. I am going to allow you some time to respond to the government. So you will have another minute or so. Thank you. Good morning. May it please the Court. Matthew Altringham on behalf of the United States. Your Honors, I'm going to limit my arguments to just the Miranda issue and also to the 1326 issue specifically regarding Ayala, as it seems that defense's arguments were limited there. Starting with the illegal reentry, this Court's previously stated that the offense of illegal reentry is a continuing offense that starts from the moment of the illegal reentry until the time that the individual is discovered by the United States authorities. In this specific case, the individual, the defendant in this case, was able to get across the border, remain in the United States, and he wasn't found in the United States and was not discovered until he came into contact with Officer Falcone at the Douglas Port of Entry. The cases have also stated that the requirement or the mens rea is really irrelevant in this case. It's the fact of where the defendant is found. The fact that this defendant was found on United States soil, his direction of travel is really irrelevant in the analysis for the illegal reentry. Because for illegal reentry after deportation, the government does not need to show the time or manner and place in which the individual crossed the border or how they crossed the border. All we need to do is show that the defendant was an alien, not legally present in the United States in the sense that he did not have documents or permission from the government to allow him to enter, that he was removed from the United States, and that he was born in a country other than the United States. In this case, we were able to show all four elements. But in this case, the argument that your opposition colleague makes is that it's not a crime to be illegally in the country, and therefore, that is what makes the difference. I disagree. I believe it is a crime to be illegally present in the country. He says it isn't. I'm sorry? That was his argument, that it isn't. That's the keystone of his argument, that it's not a crime to be in the country illegally. It is a crime to be in the country illegally. The fact that somebody is found in the United States, physically present in the United States, means that they would have had to have crossed the border. They did not have the permission to be here. Right. It's a crime to be found illegally in the country if you've previously been deported. Yes. Is it a crime to be – is it a crime if you're illegally in the country and you haven't been previously deported? No, because the – Your answer is no? Yes. Okay. So when the officer says, are you illegally in the country, and he says yes, can the officer arrest him at that point? Does he have probable cause to arrest him? At that specific moment, I believe the officer would have developed probable cause based – Why? All he knows is he's illegally in the country. You just told me it's not a crime to be illegally in the country. It's a crime to be illegally in the country if you've previously been deported. Right. It's also a crime to illegally enter the country. It's also a crime under 1325 to illegally enter the country. He didn't know that he had illegally entered the country. He only knew that he was illegally in the country. It means his green card could have expired, his visa expired, he overstayed a student visa. Lots of explanations that we get. Yes. At that point, it's not an arrest. It's a – it's equivalent to a Terry stop where the officer is just trying to develop and trying to figure out what is going on here at the border. How do we know that this wasn't an arrest? Based on the officer's actions, based on the totality of the circumstances. This happened at the pedestrian port of – at the pedestrian lane heading southbound. There were other individuals present. The officer was by himself. The officer selected this particular – He's taken. He's confined under circumstances in which it isn't apparent that he can leave. They then transport him to the border patrol. Is he handcuffed? I would not agree that he was confined. I would agree that after the defendant answered certain questions that he was handcuffed for officer safety and then brought over to the secondary inspection. The fact that the officer did not say that I'm doing this for my own safety, I don't think that that is – Wouldn't that go towards sort of the totality of the circumstances in terms of whether he thinks he can leave? The guy – if you put handcuffs on me and don't tell me, I'm just putting these on temporarily. I'm going to move you from point A to point B and I'll take the handcuffs off. That would make me think, okay, maybe this is going to turn out all right. You put the handcuffs on me and start moving me around. I don't think I'm free to leave. Would you think you were free to leave under those circumstances? No. The way the Court's phrasing it, no, I believe that that's something a little bit more. And also, but taking into account – I mean, it goes to Judge Wallace's question as to whether we're now creating an obligation for an officer to say I'm just doing this for my safety. And I don't think – and Mr. Maldonado says, well, I don't think we have to do that. But it does go to the question as to whether you think you are – you are under arrest. I would agree. Okay. So if he was – if he was handcuffed or if he was confined under circumstances in which he did not believe that he was free to leave, then he would have been arrested without probable cause. I don't believe the arrest happened out in the pedestrian lane in the port of entry. So where did the arrest occur? The arrest would have occurred back either in secondary inspection at the earliest because that's when he was placed into a cage or placed into a cell. At the latest, it would have occurred back at the – I believe the Border Patrol Station, which was a ten-minute ride away. At either of those points, did the government have information that would give them probable cause to believe that a crime had been committed? Yes. Where did they develop that? That was developed when and during the initial stop. When the defendant was asked, do you have – I believe he was asked if he had papers or documents that would allow him to remain in the United States. The defendant answered no. The defendant was also asked, are you illegally here? He answered yes. But you just told me – we just went through this, counsel, and you just told me that's not a crime. I agree. But it's all building towards a probable cause to determine if there is a crime afoot. In order to determine that, they do not have the necessary – I don't want to say documents, but the necessary means at the Douglas Port of Entry. That's why they get transferred to the Border Patrol Station, in order to fully determine if that happens. If we thought, counsel, that Mr. Garcia-Rivas was arrested without probable cause, what's the solution? If he's arrested without probable cause, I believe at that point, then it has to be remanded. You're going to have to send it back to the district court. Yes. Are you familiar with our decision in Martinez-Medina, the 2011 decision? Off the top of my head, no. Okay. I would also point out, Your Honor, that this was done at the Port of Entry, that this is done in the regular course of the officer's business, that we're looking at a slightly lower standard. Obviously, probable cause still exists, but in order to select this individual, we have different requirements at the Port of Entry. It doesn't change probable cause, though, does it? No, it does not change the probable cause, but when we're looking at a border search doctrine issue, as opposed to somebody being found out in the field, I believe we have two different analyses that need to be made. Here, clearly, we're at the Port of Entry. We're looking at a border search. This individual could possibly be carrying cash or United States currency or weapons or ammunition out of the country, which is the same reason that we select southbound vehicles for inspection. I would also note for the Court that I would say that the Miranda issue here, unless there are additional questions, I can go further into the Miranda issue as to when the waiver was done and the difference between this case and San Juan Cruz, because I would agree that there is no requirement for the government to pay for an attorney. The only requirement under Miranda is that the government provide an attorney and give the defendant access to have an attorney. In this particular case, the defendant did not testify either at the suppression hearing nor at the trial, so there is no evidence that the defendant may have been confused or misunderstood the warnings. The fact that the government read the Miranda warnings off the I-213, which is on page 216 of the ER, those warnings were read at 1646 hours, so approximately 446 in the afternoon. The counselor notification, which is on ER 215, was read four minutes later. It wasn't until after that that there was testimony that the administrative rights were read. There's no time on the administrative rights form, so based on Agent Yana's testimony that she always reads the I-214 first, which is the Miranda warnings. And then the fact that we have the time on the counselor notification leads us to the fact that the rights, I'm sorry, the administrative rights would then have been given last, so that there was no confusion, that even if the court determines that this statement would have been inadmissible based on confusion or some other reason, that it really becomes a harmless error issue because we do have a prior statement. Kennedy, you know the difficulty at the point of his arrest, was there probable cause to arrest him, and if there was, what was the basis for the probable cause? If you, if that, if it's true that there was no probable cause at the time of his arrest, the government's made after he was arrested and before he was Miranda-ized wouldn't be admissible. And if that's the case, don't we have a problem? Yes, the government would have a problem, yes. I agree. Because at that point, there is no, if you, if the court is to determine there is no probable cause for an arrest, the whole case goes away. That's the crux of the issue. Did he actually say anything between the time that he was, assuming that he was arrested when he was first stopped and the time he was given Miranda, did he say anything? No, he did not say anything. Okay. Well, then there's nothing to suppress. True. I'm having difficulty with trying to compare going in and going out. Again and again, people coming in are escorted to secondary. They know they can't leave. There's no question about it. They tried to leave there. They would use force to keep them there. And yet we don't treat that as an arrest. We treat it as being brought to secondary where there can be further discussions. And so I'm just wondering, are there cases that tell us at this border place where we, where a person has more limited rights, why it is that they can take them in their cars over to secondary, even escort them and do whatever is necessary and they're not free to leave? Why a person whose handcuffs are put on and gone to secondary is considered under arrest, when in both instances they know they're not free to leave? Have there been any cases about that? I don't believe so. And just for clarification, is the court comparing the inbound individuals versus the outbound individuals? Yeah. Under both situations, they're not free to leave. That's correct. They've never considered them under arrest when they're escorted to secondary in the inbound. And I'm wondering if there's some case that says there's a difference whether it's inbound or outbound. No. The case law addresses the inbound versus outbound in two different areas. One is in the found-in arena, which defense cites to in his brief. His case is where we're talking, I believe it is Jimenez-Canales, is a case where the defendant is flying in from Jamaica into Miami. And then there's also cases in the northern border between the United States and Canada. And those cases all discuss whether the defendant has actually made it into the country, whether he has a foothold in the country. And those cases have found that unless you've pretty much crossed that border station, that you voluntarily present yourself at the border station for inspection. And then until you have passed through inspection, you do not have that foothold. So when we're looking at it in the reverse, which is what we have here, the individual already has that foothold in the United States and is attempting to get out. I believe that taking somebody from the primary inspection area to the secondary inspection area is just furthering that terry stop. The initial stop out there falls under the border search doctrine and also under a terry stop in order to just briefly determine if there's probable cause. Bringing that person to the secondary inspection, what they're doing there is that's when they have the fingerprints, that's when they have the Miranda warnings and the consular warnings and all these other warnings that happen in an attempt to identify this individual. Unfortunately, at the Douglas Port of Entry, at the time that this arrest happened, they did not have the facilities to do it, so they had to transport the individual to the border patrol station, which was 10 to 15 minutes away. So there's that elongated secondary process in this case. But for the secondary process itself, I believe it's just part of the determination whether there's a crime that is actually occurring at that time. And the only way to determine that for an illegal reentry is to find out, was this individual removed from the United States? And the only way for the government to do that is to actually put them into the IAFIS or to run their criminal history or immigration history, and that will give us a determination, was this individual removed? At that point, we know they're physically present. We know that they've been removed. We can then look up, if they've been removed, they would have most likely been determined that they were an alien or not a citizen of the United States. They can then move on to the next query under their different database systems. Does this individual have status or does he have permission to be here? And in that short period of time, they can satisfy all four or five elements of the crime of illegal reentry. If there are no further questions. Roberts. Thank you, counsel. Thank you. Mr. Maldonado. I'm not sure if I was understanding Your Honor's question correctly. If you were wondering whether or not there are cases at secondary, if determined whether or not they're just being sent to secondary or actually taken under arrest, is that the correct rephrasing of your question, sir? I was comparing the inbound and outbound situation, is what it was, that if we're looking at the question, if the question has to do with do you think you're free to leave, I don't think inbound people think they're free to leave when they're referred to secondary. Well, I think it's a variant of are you free to leave. Are you free to leave after routine questioning would be the inquiry. I think there's multiple cases on point. Juvenile RRA is the first one that jumped into my mind. I'm sure there's a few others that exact the question at one point at a port of entry and say someone actually under arrest. Mr. Garcia-Rivas was not taken back for routine questioning. He was taken back. His shoelaces were taken away. His wallet was taken away. Nobody asked him any routine questions at the port of entry. Nobody asked him anything. They transported him to the border patrol station. That's an arrest. The question they'd ask was when he was stopped, when he said I'm here illegally. So then they go to secondary to find out what does that mean. He's confessed that much. Is there something more? And as counsel indicates, apparently at that time the computers which they needed to run the trace were not there close to the border. They were at the border patrol station where they took him. And that's not in the record, Your Honor, and I highly doubt that's true. I've crossed the border thousands of times. I'm from Douglas, Arizona. If you're coming into the country and you've been deported before, the computers are right there to tell the border patrol that. They don't have to take you anywhere else. Well, I understand. We can't rely on your relationship at Douglas any more than we can counsels at San Ysidro. But that's – I suppose we're just asking without facts. But is there a difference? Is there any case that shows there's a difference when suspicion comes up when a person comes to the border, either inbound or outbound, and they go to secondary and they know they can't – a reasonable person knows they can't leave, whether that's an arrest at that point, either inbound or outbound? Inbound, there's plenty of cases, Your Honor, and they can be sent to secondary, mainly in the drug cases of further searching the vehicle. So what's the difference between inbound and outbound, then, that they couldn't send this individual to secondary to – because of what they found out so far, that he's in the country illegally and they want to pursue whether that means a crime has been committed? Well, I think the difference is, Your Honor, is that he was actually arrested. He wasn't just sent for further questioning. Well, you're arrested when you believe you don't have a right to leave. When a person is inbound and then they go to secondary, they have absolutely no view that they can leave. They know they're there for the continuing testing. They're just the same as outbound. Yes, but they think they're only going to be held there for further questioning briefly. And once those questions are over, if there's nothing wrong – Of course, briefly. Sometimes down there they're taking off tires, they're going into gasoline tanks because they're looking for false bottoms. It isn't always just briefly. That's true, Your Honor. But I think the requisite inquiry would be the difference between those cases and this case is that he was physically taken away from the port of entry. He was physically transported to another location in handcuffs. Those people who are waiting for their vehicle are waiting at the port of entry. So if – so you would distinguish it if the secondary, wherever secondary is, is a certain distance away from the port, then we make a distinction between the cases. I think the evidence of arrest is much stronger when they are put in the back of a vehicle, a Border Patrol vehicle, and transported to a different facility. That's true, but – and he's not – doesn't feel he's free to leave. Suppose the secondary – inbound they had to go three blocks and then the secondary search took place. That would make a difference of whether it was right there at the Border Patrol. I'm not quite understanding how this differentiation would be made. My differentiation is that it was outside of the routine. The routine secondary is not to take someone to the Border Patrol station. No. The routine is to go to secondary. But suppose the secondary is the Border Patrol station. That's the only place where they have the computers at that time. Assume that. If that was the routine and everybody was taken there, then it's just – then the argument would be very strong that it is simply a secondary inspection and not a formal arrest. Well, there may not be enough record here for us to make the decision, but I just wanted to get your view on that. Thank you, Your Honor. Any further questions? I think we've taken you well over your time. We appreciate your responses and we appreciate the argument of both counsel, and the case will be submitted. Thank you, Your Honor. That completes the oral argument calendar, and the Court will stand in recess until tomorrow morning. Thank you.
judges: Wallace, Farris, Bybee